Thomas Buchele, OSB No. 081560
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97219-7799
Tel: 503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

Austin Starnes, OSB No. 224970
Blue Mountains Biodiversity Project
5113 SE 30th Ave, Apt 237
Portland, OR 97202
Tel: 317-964-3776
Email: austin@bluemountainsbiodiversityproject.org

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### MEDFORD DIVISION

| | |
|---|---|
| **BLUE MOUNTAINS BIODIVERSITY PROJECT**, an Oregon nonprofit corporation, | Case No. 1:22-cv-01500-CL |
| Plaintiff, | **RESPONSE TO DEFENDANTS' MOTION TO DISMISS** |
| v. | **Oral Argument Requested** |
| **HOMER WILKES**, Under Secretary for Natural Resources and Environment, United States Department of Agriculture, in his official capacity; **UNITED STATES DEPARTMENT OF AGRICULTURE**, AN agency of the United States, **GLENN CASAMASSA**, Regional Forester for Region 6, in his official capacity; **SHANE JEFFRIES**, Forest Supervisor, Ochoco National Forest, in his official capacity; **MICHAEL RAMSEY**, District Ranger for the Lakeview District, Fremont-Winema | |

RESPONSE TO DEFENDANTS' MOTION TO DISMISS

National Forest, in his official capacity;
**UNITED STATES FOREST SERVICE**,
an agency of the United States Department
of Agriculture,

       Defendants.

RESPONSE TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

TABLE OF ACRONYMS ................................................................................................. v

I.    INTRODUCTION ............................................................................................... 1

II.   STANDARD OF REVIEW ................................................................................ 4

III.  FACTUTAL BACKGROUND ......................................................................... 4

IV.   LEGAL BACKGROUND ................................................................................. 8

      A. National Forest Management Act ............................................................ 8

      B. Administrative Procedure Act ................................................................ 10

V.    ARGUMENT ................................................................................................... 11

      A. The Forest Service violated NFMA and their implementing regulations by failing to
      provide the public with an opportunity to object to the 2021 Eastside Screens Amendment
      to the FWNF Forest Plan ........................................................................... 11

            i. The regulation 36 C.F.R. § 219.51(b) is not ambiguous, and therefore,
            Defendants' interpretation is not due deference ..................................... 11

            ii. Even if the Court believes the regulation to be ambiguous, Defendants'
            interpretation is not reasonable, and is therefore not due deference ...................... 19

      B. The Under Secretary did not adequately explain why there would be no objection
      process for the 2021 Eastside Screens Amendment ........................................... 23

VI.   CONCLUSION ................................................................................................ 26

APPENDIX

<u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)........................................9, 15

*Attias v. Crandall*, 968 F.3d 931 (9th Cir. 2020)..................................................12, 19

*Auer v. Robbins*, 519 U.S. 452 (1997) ........................................................................12

*Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692
    (9th Cir. 2004)......................................................................................13

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) ...............................................................4

*Bennet v. Spear*, 520 U.S. 154 (1997)........................................................................10

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984)...........................................12

*Christensen v. Harris Cnty.*, 529 U.S. 576 (2000)..............................................................12

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S 402 (1971)................................................24

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150 (2021) ....................11, 24

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Service*, 726 F. Supp. 2d 1195
    (D. Mont. July 27, 2010)..............................................................................25

*Gifford Pinchot Task Force v. Perez*, No. 03:13-cv-00810-HZ, 2014 WL 3019165
    (D. Or. July 3, 2014) ...............................................................................10, 24

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ...................................................... *passim*

*Merrill Ditch-Liners, Inc. v. Pablo,* 670 F.2d 139 (9th Cir. 1982)..............................................24

*Moreno v. Utiliquest, LLC*, 29 F.4th 567 (9th Cir. 2022) ......................................................4

*Motor Vehicles Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..............................................................................10, 11, 24

*Sec'y of Lab., U.S. Dep't of Lab. v. Seward Ship's Drydock, Inc.*, 937 F.3d 1301
    (9th Cir. 2019)......................................................................................12

*Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001 (9th Cir. 2008)................................................4

*Starr v. Baca*, 652 F. 3d 1202 (9th Cir. 2011) ..................................................4

*U.S. v. Home Concrete & Supply, LLC*, 566 U.S. 478 (2012)......................................19

*Wild Virginia v. U.S. Forest Service*, 24 F.4th 915 (4th Cir. 2022)........................17, 18

## Statutes

5 U.S.C. § 701...........................................................................................24

5 U.S.C. § 702...........................................................................................10

5 U.S.C. § 704.......................................................................................10, 15

5 U.S.C. § 706(2)(A)...................................................................................10

16 U.S.C. § 1604..........................................................................................8

16 U.S.C. § 1604(i)......................................................................................10

## Regulations

36 C.F.R. § 217.4........................................................................................20

36 C.F.R. Part 218.......................................................................................17

36 C.F.R. § 218.3(a).....................................................................................17

36 C.F.R. Part 219....................................................................................8, 19

36 C.F.R. Part 219, Subpart A (2012)................................................................8

36 C.F.R. Part 219, Subpart B (2012)..............................................1, 6, 13, 15

36 C.F.R. § 219.1(c).......................................................................................8

36 C.F.R § 219.4(a).......................................................................................8

36 C.F.R § 219.4(a)(1)...................................................................................8

36 C.F.R. § 219.5(2)(ii)...........................................................................8, 14

36 C.F.R. § 219.50.......................................................................................11

36 C.F.R. § 219.51(b) ........................................................................ *passim*

36 C.F.R. § 219.51(d) ........................................................................ *passim*

36 C.F.R. § 219.52(a).....................................................................................6

36 C.F.R. § 219.53(a).....................................................................................6

36 C.F.R. § 219.54.......................................................................................19

36 C.F.R. § 219.56(e) ..............................................................................................13

36 C.F.R. § 219.57(b)(3) .........................................................................................15

36 C.F.R. § 219.62 ..................................................................................................13

40 C.F.R. § 1508.9 ..................................................................................................25

40 C.F.R. § 1508.23 (2019) ...............................................................................15, 16

## Other Authority

77 Fed Reg. 21,247–48 (Apr. 9, 2012) ...............................................................18, 20

85 Fed. Reg. 48,500–01 (Aug. 11, 2020) .................................................................5

85 Fed. Reg. 48,501 .................................................................................................6

85 Fed. Reg. 55,409 (Sept. 8, 2020) ........................................................................6

FRCP 12(b)(6) ................................................................................................1, 4, 26

Forest Serv., Handbook 1909.12, ch. 20, § 21.12 (2015) .......................................16

Forest Serv., Handbook 1909.15, ch. 10, § 11.2 (2012) .........................................16

Merriam-Webster.com Dictionary (last visited Feb. 4, 2023) .................................13

Oxford English Dictionary (3d. ed. 2007) ...............................................................13

*The Objection Process for Decisions on Land Management Plans 36 CFR 219 Subpart B*
     *available at* https://www.fs.usda.gov/Internet/FSE_DOCUMENTS
     /fseprd589506.pdf .............................................................................................9

**TABLE OF ACRONYMS**

APA                              Administrative Procedure Act

BMBP                          Blue Mountains Biodiversity Project

CE                                Categorical Exclusion

DN                                Decision Notice

EA                                Environmental Assessment

EIS                              Environmental Impact Statement

FEA                              Final Environmental Assessment

FONSI                          Finding of No Significant Impact

HRV                              Historic Range of Variability

LOS                              Late and Old Structure

NEPA                            National Environmental Policy Act

NFMA                          National Forest Management Act

PEA                              Preliminary Environmental Assessment

## I.    <u>INTRODUCTION</u>

Plaintiff Blue Mountains Biodiversity Project's ("BMBP") Complaint outlines three counts of legal violations under the National Forest Management Act ("NFMA") and the Administrative Procedure Act ("APA"). *See* ECF No. 1, at 21–22, ¶¶ 65–67. BMBP's first claim challenges the United States Forest Service's illegal approval of the 2021 *Eastside Screens Amendment: Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington* ("Eastside Screens Amendment") without holding a pre-decisional administrative review process ("objection process") as required by 36 C.F.R. Part 219, Subpart B (2012). *Id.* at 21, ¶ 65. BMBP's second claim challenges Defendants' lack of explanation as to why the 2021 Eastside Screens Amendment was not subject to the objection process, as required by 36 C.F.R. § 219.51(d). *Id.* at 22, ¶ 66. Because the 2021 Eastside Screens Amendment amended the Land and Resource Plan ("LRMP" or "Forest Plan") for the Fremont-Winema National Forest ("FWNF"), BMBP's third claim challenges the approval of the South Warner Habitat Restoration Project ("South Warner Project" or "Project"), which relies upon the illegally amended FWNF Forest Plan to authorize the logging of trees up to 30" diameter at breast height ("DBH"). *Id.* at 22, ¶ 67. Defendants argue all three claims fail as a matter of law and seek their dismissal with prejudice pursuant to the FRCP 12(b)(6). ECF No. 24. The Court should deny that motion and order Defendants to answer BMBP's complaint and produce the administrative record underlying the challenged agency actions.

On December 27, 2021, Defendant Michael Ramsey approved the South Warner Project, which authorized the commercial logging of up to 16,000 acres on the FWNF in Lake County, Oregon. ECF No. 1, at 20, ¶¶ 58–61. This includes the logging of large trees up to 30" DBH, which are vital not only for biodiversity and wildlife habitat, but also for storing carbon that would otherwise be contributing to climate change and global warming. *Id.* at 10, 20, ¶¶ 38, 58. The logging of these large trees on the FWNF is only possible because the South Warner Project relied on the illegal 2021 Eastside Screens Amendment to the FWNF Forest Plan. *Id.* at 21, ¶ 63. The FWNF Forest Plan had previously incorporated the original Eastside Screens' standard that

prohibited logging trees ≥21" DBH (the "21" Rule"). *Id.* at 2, ¶ 2. Following the illegal 2021 Eastside Screens Amendment, the 21" Rule was replaced with a voluntary guideline that allows for the logging of large grand and white fir trees up to 30" DBH. *Id.* at 17, ¶ 53. Therefore, the South Warner Project represents an illegal and environmentally destructive agency action, in violation of NFMA and the APA. *Id.* at 21, ¶ 63.

The 2021 Eastside Screens Amendment violated two Forest Service Regulations promulgated under NFMA. *Id.* at 18−19, ¶¶ 55−56. After initially notifying the public that interested parties would have an opportunity to comment on and object to the responsible official's proposal to amend the Eastside Screens, the Service took advantage of and violated the trust the public had placed in the administrative system by having then-Under Secretary for Natural Resources and Environment for the United States Department of Agriculture James Hubbard (a political office now held by Defendant Homer Wilkes) inappropriately sign the final Decision Notice ("DN") for the 2021 Eastside Screens Amendment. *Id.* at 17−18, ¶ 54−55. This was done in an attempt to skirt around the requirement to hold an objection process for this controversial agency action by subjecting the amendment to the exception found at 36 C.F.R. § 219.51(b). *Id.* Moreover, this was done on January 12, 2021, *id.,* which was just days before a new administration took over the executive branch.  Further, instead of attempting to explain why such a bait-and-switch was appropriate or even potentially necessary, the Under Secretary and Forest Service violated 36 C.F.R. § 219.51(d) by failing to provide any explanation beyond misquoting and misapplying the language of § 219.51(b). *Id.* at 19, ¶ 56. Such violations of the Forest Service regulations promulgated under NFMA render the entire 2021 Eastside Screens Amendment illegal.

It is important for the Court to understand exactly what the Defendants are arguing here in support of their motion seeking to have BMBP's claims dismissed as a matter of law. First, the Forest Service does have a regulation that exempts plan amendments that the Secretary or Under Secretary of Agriculture "proposed" from the Forest Service's objection process. 36 C.F.R. § 219.51(b). However, Defendants argue that, in order for the Under Secretary to be able to act

RESPONSE TO DEFENDANTS' MOTION TO DISMISS                                          2

"nimbly," the word "proposed" actually means any decision on a plan amendment that the Under Secretary ultimately "makes" or "signs." *See* ECF 24 at 2–3. This interpretation of the unambiguous regulation allows the Under Secretary to "nimbly" intervene in an ongoing agency decision-making process, at the very end of that process, and deny the public an objection process. Defendants' interpretation allows for this, despite repeated promises from the agency that there would be such an objection process, simply by having the Under Secretary sign a decision approving a plan amendment that the Under Secretary did not "propose." And here, this nimble action occurred just days before a new administration took office. Second, even if the Under Secretary in fact had this authority under Section 219.51(b), 36 C.F.R. § 219.51(d) requires that the Under Secretary "include an explanation" when a plan amendment decision is not subject to the objection process. Here, defendants insist that the only required explanation was for the Under Secretary to state that the decision was exempt from the objection process because he "signed" it. In other words, according to Defendants, the Under Secretary has no obligation to explain why he denied the public the promised objection process by stepping in to approve a plan amendment that he did not "propose." This is exactly the type of arbitrary and capricious decision-making that the APA prohibits.

Nothing BMBP is arguing, claiming, or alleging would prevent Defendants from making "nimble" decisions or lead to absurd results. BMBP's claims, and Defendants' own unambiguous regulations, simply limit which decisions Defendants can exempt from the important objection process. If the Under Secretary wants to avoid that process, the Under Secretary can propose the action he wants to take, just as the Defendants' regulations allow. What Defendants' regulations do not allow is for a local or regional Forest Service official to propose an important plan amendment, to repeatedly promise the interested public that the proposed amendment will be subject to an objection process, and for the Under Secretary to then claim the authority to subsequently approve and sign the final amendment without allowing for an objection process and without a rational explanation for why he is exercising his supposed discretion in that way.

The Court should therefore reject Defendants' arguments that they have this type of authority as matter of law and deny their motion to dismiss.

## II.   <u>STANDARD OF REVIEW</u>

Defendants cite to a 1988 Ninth Circuit case decided before more recent Supreme Court jurisprudence on the matter of a FRCP 12(b)(6) Motion to Dismiss, such as *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), for the requisite standard of review. Accordingly, the correct standard of review is explained here.

As this is in Response to Defendants' Federal Rules of Civil Procedure ("FRCP") 12(b)(6) Motion to Dismiss, the Court must accept all well-pled factual allegations in BMBP's Complaint as true, and must further draw all reasonable inferences in favor of BMBP as the nonmoving party. *Moreno v. Utiliquest, LLC*, 29 F.4th 567, 573 (9th Cir. 2022) (citing *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008)). A reviewing court requires more than a simple notice of legal claim. Instead, such claims, supported by the factual allegations in a complaint, must be plausible. *Starr v. Baca*, 652 F. 3d 1202, 1213 (9th Cir. 2011). In order to survive a motion to dismiss, a legal complaint must meet two requirements:

> First, to be entitled to the presumption of truth, allegations in a complaint … may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing part to be subjected to the expense of discovery and continued litigation.

*Id.* at 1216.

BMBP's Complaint, ECF No. 1, contains three valid legal claims supported by the factual allegations outlined below. ECF No. 1, at 21–22, ¶¶ 65–67. These facts plausibly support BMBP's entitlement to its requested relief. *Id.* at 22–23. Therefore, Defendants' Motion to Dismiss must be denied.

## III.   <u>FACTUAL BACKGROUND</u>

Beginning in the early 1990s, in response to the environmental crises surrounding the continued viability of species west of the Cascade Mountains, the Regional Forester began

developing management directives to avoid similar issues in eastern Oregon and southeastern Washington. ECF No. 1, at 13–14, ¶ 48. A key issue identified by the Regional Forester on national forests east of the Cascades was the absence of both large trees and large snags necessary for terrestrial, avian, and aquatic habitat across the landscape—the result of nearly a century of excess logging under the management of the Forest Service. *Id.* These findings resulted in the implementation of a wildlife standard across six national forests in eastern Oregon and southeastern Washington, including the FWNF, that prohibited the logging of "live trees" ≥21" DBH (the "21" Rule") and prohibited all logging in late and old structure ("LOS") stands below the historic range of variability ("HRV"). *Id.* at 15, ¶ 49. These standards, signed and approved by the Regional Forester, are known as the "Eastside Screens." *Id.*

Beginning in 2020, the Forest Service began the process of revising the Eastside Screens, describing its intent to "replace the 21" standard with a guideline that emphasizes recruitment of old trees and large trees" in the Federal Register. Notice to initiate a land management plan amendment and notice of availability, 85 Fed. Reg. 48,500–01 (Aug. 11, 2020); ECF No. 1, at 16, ¶ 50. This official Notice specified that "[t]he *proposal* would amend the land management plans for the Deschutes, Fremont-Winema, Malheur, Ochoco, Umatilla, and Wallowa-Whitman National Forests in Oregon," and listed Ochoco Forest Supervisor Shane Jeffries as the Responsible Official for the proposal, noting that "the Responsible Official will decide whether to select the *proposed* action, another alternative, or a combination of alternatives." 85 Fed. Reg. 48,500–01 (emphasis added). Emily Platt was identified as the "Team Leader," and the Notice itself was filed by Allen Rowley, Associate Deputy Chief, National Forest System. *Id.* Further, this Notice explicitly and affirmatively told the public that "[t]his EA is subject to Forest Service regulation 36 CFR 219, Subpart B, known as the administrative review, or objection, process." *Id.*; ECF No. 1, at 16, ¶ 50. This Federal Register Notice specifically ties a Forest Plan amendment proposal to the listed Responsible Official, noting that, "[w]hen proposing a Forest Plan Amendment, the 2012 Planning Rule (36 CFR 219), as amended, requires the responsible

official to identify the substantive requirements of the rule that are likely to be directly related to the amendment." 85 Fed. Reg. 48,501.

A subsequent Federal Register Notice extending the public comment period for the 2021 Eastside Screens Amendment, "a *proposed* amendment to land management plans" including the FWNF Forest Plan, indicated that comments in the form of "[h]ardcopy letters must be submitted to the following address: Shane Jeffries, Forest Supervisor, Ochoco National Forest, 3160 NE Third Street, Prineville, OR 97754." 85 Fed. Reg. 55,409 (Sept. 8, 2020) (emphasis added); ECF No. 1, at 16, ¶ 51. Emily Platt was still listed as the Team Leader, while this Notice was filed by Tina Johna Terrel, Associate Deputy Chief, National Forest System. 85 Fed. Reg. 55,409. Again, this Notice affirmatively stated to the public that "[t]his EA is subject to Forest Service regulation 36 C.F.R. § 219, Subpart B, known as the administrative review, or objection, process." *Id.*; ECF No. 1, at 16, ¶ 51. Nowhere in these public notices was it ever stated or even implied that the 2021 Eastside Screens Amendment proposal was proposed or was to be ultimately decided by the Under Secretary for Natural Resources and Environment.

To secure its regulatory-established right to comment on and object to the Final Environmental Assessment ("FEA") and Draft Decision Notice ("DN"), BMBP submitted substantive comments on the 174-page preliminary EA ("PEA") during the sole opportunity for public input provided by the agency for a decision impacting vast swaths of public land in eastern Oregon and southeastern Washington. 36 C.F.R. § 219.53(a); ECF No. 1, at 17, ¶ 53. BMBP brought to the Forest Service's attention its concerns regarding how the agency failed to notify the public of the availability of an objection period in any of the National Environmental Policy Act ("NEPA") documents associated with the 2021 Eastside Screens Amendment, as required by 36 C.F.R. § 219.52(a). ECF No. 1, at 17, ¶ 53. BMBP's comments also included numerous substantive concerns with regarding the environmental impacts of the 2021 Eastside Screens Amendment to the national forests east of the Cascades. *Id.* at 17, ¶ 53.

The Forest Service published the FEA and final Decision Notice/Finding of No Significant Impact ("DN/FONSI") for the 2021 Eastside Screens Amendment on January 12,

2021, shortly before the end of the prior political administration. *Id.* at 17–18, ¶¶ 54–55. The 246-page FEA contained over 70 pages of additional analysis not found in the PEA, including analyses specifically addressing the environmental impacts to wildlife and plant species found on the FWNF. *Id.* at 17–18, ¶ 54. Because of the Forest Service's reneging on its promise of an objection process, the public—including BMBP— never got the opportunity to review, comment on, and object to this additional analysis and the final decision outlined in the DN/FONSI. *Id.* at 17–18, ¶¶ 54–55. The FEA and DN/FONSI were the first and only documents associated with the 2021 Eastside Screens Amendment that made any mention of Under Secretary Hubbard having anything to do with the amendment, let alone being the Responsible Official. *Id.* at 18, ¶ 55. Further, the Under Secretary provided no explanation for why he felt it appropriate or necessary to sign the DN/FONSI, as required by 36 C.F.R. § 219.51(d). ECF No. 1, at 19, ¶ 56.

The 2021 Eastside Screens Amendment is not problematic just because of the Forest Service's procedural missteps throughout the administrative process, although the degradation of federal agency accountability it represents is certainly alarming. BMBP's substantive concerns regard the replacement of the 21" Rule—a mandatory standard present in the FWNF Forest Plan over a quarter of a century—with a voluntary guideline. *Id.* at 17–18, ¶ 54. Such a guideline allows the Forest Service—a federal agency that has seems to believe it shouldn't be beholden to the public whose forests they are entrusted with protecting—to log large trees up to 30" DBH across a landscape on which they are already at a deficit. *Id.*

Following the illegal approval of the 2021 Eastside Screens Amendment, which amended the FWNF Forest Plan, Forest Service officials implemented the new voluntary guideline authorizing the logging of white fir trees up to 30" DBH for the first time with the South Warner Project. *Id.* at 20, ¶ 58. BMBP submitted substantive comments detailing its concerns regarding the environmental impacts of the South Warner Project and its reliance on the illegal 2021 Eastside Screens Amendment during the Project's scoping period on July 19, 2021. *Id.* at 20, ¶ 59. Given that this is the Forest Service's first implementation of the 2021 Eastside Screens Amendment, BMBP's current challenge includes allegations regarding the illegality of both the

South Warner Project and the amended FWNF Forest Plan on which it relies. *See id.* at 21–22,
¶¶ 65–67.

### IV.    LEGAL BACKGROUND

#### A. National Forest Management Act

NFMA, the statute that provides the Forest Service the authority to manage the national
forests of the United States of America, emphasizes planning as a vital aspect of its statutory and
regulatory structure. 16 U.S.C. § 1604; 36 C.F.R. Part 219, Subpart A (2012). The Forest
Service's planning regulations, promulgated in 2012 and amended in 2016, place great
importance on public involvement and a collaborative approach to the management of our
nation's national forests. *See generally* 36 C.F.R. Part 219. The intent of these regulations to
include the interested members of the public as much as possible does not need to be inferred, as
it can found explicitly throughout Part 219.

"The purpose of [Part 219] is to guide the collaborative and science-based development,
amendment, and revision of land management plans that promote the ecological integrity of
national forests…" 36 C.F.R. § 219.1(c). "The responsible official shall provide opportunities to
the public for participating in the assessment process; developing a plan proposal, …;
commenting on the proposal and the disclosure of its environmental impacts…." 36 C.F.R §
219.4(a). "The responsible official shall engage the public – including … public and private
organization or entities – early and throughout the planning process as required by this part,
using collaborative processes where feasible and appropriate." 36 C.F.R § 219.4(a)(1). In
specifically discussing "[p]lan development, plan amendment, or plan revision," the regulations
require: "[p]reliminary identification of the need to change the plan, development of a proposed
amendment, consideration of the environmental effects of the proposal, providing an opportunity
to comment on the proposed amendment, *providing an opportunity to object before the proposal
is approved*, and, finally, approval of the plan amendment." 36 C.F.R. § 219.5(2)(ii) (emphasis
added).

This importance placed on public involvement and a collaborative approach to national forest management extends to the objection process. The objection process replaced the former post-decisional appeal process, which was "often problematic because if a Reviewing Officer found a fault with a plan already in effect, the remedy was often costly to both the Forest Service and the public in terms of time, money, and trust." U.S. Forest Serv., *The Objection Process for Decisions on Land Management Plans 36 CFR 219 Subpart B*, at 1, *available at* https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd589506.pdf. The intent behind the objection process was to improve the efficiency of plan amendments by "[c]onsidering public concerns **before** a final decision is made … resulting in better, more informed decisions." *Id.* "This approach fits well with a collaborative approach to planning, and encourages participants to resolve issues with the Forest Service before a plan, plan amendment, or plan revision is approved." *Id.* The objection process is the final opportunity for the Forest Service and interested members of the public to discuss and resolve disparate views on the implications of forest management decisions before a final decision is issued, and the failure of the Forest Service to hold an appropriate objection process not only harms public trust in the system, but harms the interests of interested parties as well. *See All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137–1138 (9th Cir. 2011).

This is all to say, far from this case "represent[ing] an attack on the authority vested in the Under Secretary of the Department of Agriculture to manage our national forests[,]" ECF No. 24, at 2, this case is about restoring the public's trust in the administrative system tasked with the management of our public lands. The regulations at issue in this case are very clear and unambiguous in terms of what is required of the Forest Service. As the text of 36 C.F.R. § 219.51(b) explains, "[p]lans, plan amendments, or plan revisions *proposed* by the Secretary of Agriculture or Under Secretary for Natural Resources and Environment are not subject to [the objection process]." (emphasis added). The subsequent sentence simply indicates that "[a] decision by the Secretary or Under Secretary constitutes the final administrative determination of the U.S. Department of Agriculture," signifying when an agency decision is ripe for judicial

review. *Id.* And finally, "[w]hen a plan, plan amendment, or plan revision is not subject to objection under this subpart, the responsible official shall include an explanation with the signed decision document." 36 C.F.R. § 219.51(d).

Any actions undertaken by the Forest Service on a national forest must be consistent with the applicable Forest Plan. 16 U.S.C. § 1604(i). Therefore, a project such as the South Warner Project must be consistent with a legally valid version of the FWNF Forest Plan. Because the FWNF was illegally amended with the 2021 Eastside Screens Amendment, and because the South Warner Project relies upon that illegally amended plan, the South Warner Project itself is an illegal agency action in violation of NFMA and its implementing regulations to the extent it relies upon the illegally approved amendment.

**B. Administrative Procedure Act**

The Administrative Procedure Act ("APA") provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," which in this case is NFMA, which does not itself provide for judicial review. 5 U.S.C. § 702. For an APA claim to be ripe for judicial review, there must be a "final agency action." 5 U.S.C. § 704. An agency's action is "final" when it represents the consummation of the agency's decision-making process, where right or obligations have been determined or legal consequences flow. *Bennet v. Spear*, 520 U.S. 154, 177–78 (1997).

The APA instructs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). For an agency actions to withstand APA scrutiny, the agency "must examine the relevant data and articulate a satisfactory explanation for its action." *Gifford Pinchot Task Force v. Perez*, No. 03:13-cv-00810-HZ, 2014 WL 3019165, at *3 (D. Or. July 3, 2014) (citing *Motor Vehicles Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The *State Farm* court reaffirmed the principle that "an agency must cogently explain why it has exercised its discretion in a given manner." 463 U.S.

29, 48–49 (1983) (collecting cases); *see also Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) ("The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained.").

## V.    ARGUMENT

### A.    The Forest Service violated NFMA and their implementing regulations by failing to provide the public with an opportunity to object to the 2021 Eastside Screens Amendment to the FWNF Forest Plan.

This argument concerns the failure of the Forest Service to provide the public an opportunity to object to the 2021 Eastside Screens Amendment to the FWNF Forest Plan, rendering the amendment illegal. ECF No. 1, at 21, ¶ 65. Because the South Warner Project relies upon the amended FWNF Forest Plan, the Service's authorization of the Project is similarly an illegal agency action under NFMA and the APA. *Id.* at 22, ¶ 67. The main thrust of BMBP's legal claim is that the natural interpretation of objection process exception found at 36 C.F.R. § 219.51(b) requires the Under Secretary to actually *propose* a forest plan amendment. Here, because the Under Secretary was not involved in the 2021 Eastside Screens Amendment process in any way before he simply signed the FEA and Final DN/FONSI, there is no legal basis for exempting the amendment from the objection process under 36 C.F.R. § 219.51(b). In contrast, Defendants argue that proposing an amendment and making a decision about that amendment are the same actions. *See* ECF No. 24, at 6–11. This interpretation would thus allow the Under Secretary to both *propose* and *make* a forest plan amendment by simply signing the relevant decision document, even if the Under Secretary had not been involved in the actual formation and analysis of that amendment before that decision is made. This interpretation is arbitrary and capricious, and therefore cannot withstand judicial scrutiny.

### i.    The regulation 36 C.F.R. § 219.51(b) is not ambiguous, and therefore, Defendants' interpretation is not due deference.

The 2021 Eastside Screens Amendment was not proposed by the Under Secretary for Natural Resources and Environment, and as such, was required to undergo an objection process. 36 C.F.R. § 219.50; 36 C.F.R. § 219.51. Defendants' contrary arguments in their Motion to

Dismiss boil down to a claim of deference to the Forest Service's interpretation of the word "proposed," as used in 36 C.F.R. § 219.51(b), the full text of which provides:

> Plans, plan amendments, or plan revisions proposed by the Secretary of Agriculture or the Under Secretary for Natural Resources and Environment are not subject to the procedures set forth in this section. A decision by the Secretary or Under Secretary constitutes the final administrative determination of the U.S. Department of Agriculture.

Although never explicitly cited in Defendants' brief, such deference is known as *Auer* deference, which generally requires courts defer to "an agency's reasonable reading of its own *genuinely ambiguous* regulations." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2404 (2019) (citing *Auer v. Robbins*, 519 U.S. 452 (1997)) (emphasis added). However, the Supreme Court notes that "a court should not afford *Auer* deference unless, after exhausting all the 'traditional tools' of construction, … the regulation is genuinely ambiguous. *Kisor*, 139 S. Ct. at 2404 (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 843, n. 9 (1984). The issue with Defendants' argument is that the regulation at issue, 36 C.F.R. §219.51(b), is not genuinely ambiguous, or even vaguely so. "[I]f there is only one reasonable reading construction of a regulation … then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense. Deference in that circumstance would 'permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.'" *Kisor*, 139 S. Ct. at 2415 (citing *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000)).

*Kisor* calls for the use of the "traditional tools" of construction to determine if regulatory language is indeed ambiguous. 139 S. Ct. at 2415. Although Defendants claim they are applying the "plain meaning" of their regulation, ECF 24 at 3, Defendants in fact go to great lengths to obfuscate and inject ambiguity into this regulation. However, the first canon of construction to be applied is to simply use the ordinary meaning of word. *See Attias v. Crandall*, 968 F.3d 931, 937 (9th Cir. 2020) ("The phrase seems plain enough, but our instincts are confirmed in various dictionaries…."); *see also Sec'y of Lab., U.S. Dep't of Lab. v. Seward Ship's Drydock, Inc.*, 937 F.3d 1301, 1308 (9th Cir. 2019) ("We begin with the text and structure of [the regulation]. 'A regulation should be construed to give effect to the natural and plain meaning of its words.'")

(citing *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 698 (9th Cir. 2004)). Despite Defendants' best attempts to sway the Court otherwise, the verb "propose"—used here in its past participle form—has an ordinary meaning that implicates an origin. Merriam-Webster's Dictionary defines "propose" as "to form or put forward a plan or intention." *Propose*, Merriam-Webster.com Dictionary (last visited Feb. 4, 2023). It lists synonyms including "suggest," "pose," and "offer," all of which indicate the beginning of a process rather than the culmination. *Id.* The Oxford English Dictionary similarly denotes an origin, defining the intransitive verb "propose" as "to form an intention or design." *Propose*, Oxford English Dictionary (3d. ed. 2007). Even in its transitive form, Oxford defines it as "[t]o put forward or suggest as a scheme, plan, or course of action; to recommend or advocate *that* something be done." *Id.* (emphasis in original). These ordinary meanings, and indeed any natural interpretation of the word "propose," clearly indicate a difference between the proposal of a plan and the culmination, or approval, of a plan.

Another canon of construction to determine if ambiguity exists is to look at the text at issue in the context of the greater regulatory scheme. Despite Defendants' protestations that "proposed" does not contemplate an origin, when looking at the regulatory scheme of the objection process, it becomes clear that the origin of a proposal is imperative to the regulatory scheme as a whole. As the regulatory text of Subpart B explains, objections are to be filed with the appropriate "reviewing officer," which "is the U.S. Department of Agriculture (USDA) or Forest Service official having the delegated authority and responsibility to review an objection filed under this subpart. The reviewing officer is a *line officer at the next higher administrative level above the responsible official*." 36 C.F.R. § 219.56(e) (emphasis added). The "responsible official" is "the official with the authority and responsibility to *oversee the planning process* and to approve a plan, plan amendment, and plan revision[,]" again indicating the responsible official is one involved in the process before the final decision is made. 36 C.F.R. § 219.62 (emphasis added). A logical understanding of this process would therefore indicate that the origin of a proposal is a prerequisite requirement for the objection process to function as intended. Without

knowing the origination of a proposal, the Forest Service would have no way of ensuring the reviewing officer is the line officer at the next higher administrative level above the responsible official. Further, the regulatory scheme clearly uses "proposed" and "approve" to refer to different actions:

> The process for amending a plan includes: Preliminary identification of the need to change the plan, *development of a proposed amendment*, consideration of the environmental effects of the proposal, providing an opportunity to comment on the proposed amendment, *providing an opportunity to object before the proposal is approved*, and, finally, approval of the plan amendment.

36 C.F.R. § 219.5(2)(ii) (emphasis added).

Defendants' argument entirely reads out of existence the first step of the process outlined by the Supreme Court in *Kisor*, ignoring the fact that the regulation is unambiguous in its meaning and skipping directly to arguing for an unnatural and legally untenable definition of the word "proposed."[1] *See* ECF No. 24, at 6–11. If one were to follow the definition Defendants argue for, the Under Secretary is presumably able to both propose and approve a decision in one fell swoop with the simple signing of a Decision Notice. *See* EFC No. 24, at 9–10. However, such a definition ignores the months of analysis and planning that went into the 2021 Eastside Screens Amendment before a final decision was made that the Under Secretary apparently did not participate in. This allows the Under Secretary to both ignore and withdraw the repeated promises of an objection process made by the agency to the public before the Under Secretary decided to become involved in this plan amendment process.

In support of this definition, Defendants' citation to 36 C.F.R. § 219.51(b) at ECF No. 24, at 6 creates one sentence out of what is originally two. However, the two sentences in the original text of the regulation serve two different functions, and combining them as Defendants have done here obfuscates their respective purposes.

---

[1] If Defendants, in their Reply brief, affirmatively claim that 36 C.F.R. § 219.51(b) is ambiguous, BMBP hereby reserves its right to seek from the Court permission to file a sur-reply in order to address this new argument for the first time.

RESPONSE TO DEFENDANTS' MOTION TO DISMISS                                     14

The first sentence, in its entirety, reads: "Plans, plan amendments, or plan revisions proposed by the Secretary of Agriculture or the Under Secretary for Natural Resources and Environment are not subject to the procedures set forth in this section." 36 C.F.R. § 219.51(b). This plain meaning of this sentence, as discussed above, allows for the forgoing of the objection process detailed in Subpart B should the Under Secretary form, pose, or suggest a plan amendment. The second sentence, in its entirety, reads: "A decision by the Secretary or Under Secretary constitutes the final administrative determination of the U.S. Department of Agriculture." *Id.* This sentence, with its reference to a "final administrative determination," serves to denote that "[a] decision by the … Under Secretary" creates a final agency action which is then ripe for judicial review under the APA. 5 U.S.C. § 704. This interpretation naturally makes sense when one considers that, under normal circumstances, there would not be a final agency action for a Forest Plan amendment ripe for judicial review until the culmination of the pre-decisional objection process. *See All. for the Wild Rockies*, 623 F.3d at 1137–38 (9th Cir. 2011); 36 C.F.R. § 219.57(b)(3) (defining the response of the [objection] reviewing officer as "the final decision of the U.S. Department of Agriculture"). To say then that "[a] decision by the … Under Secretary" is necessarily one that is "proposed by the … Under Secretary" and therefore not subject to the objection process not only renders the first sentence superfluous, but ignores the greater regulatory scheme at issue. 36 C.F.R. § 219.51(b).

Skipping over the usual tools of interpretation and simply assuming the regulation at issue is ambiguous and therefore subject to their interpretation, Defendants insist that the verb "proposed" actually means "signed" or "made." Defendants analogize the verb "proposed" with the noun "proposal" in pursuit of their preferred definition. ECF No. 24, at 9–10. In doing so, Defendants pull from an earlier version of  the Council on Environmental Quality's NEPA implementing regulations published at 40 C.F.R. § 1508.23 (2019), which provides that a proposal "exists at that stage in the *development* of an action when an agency … has a goal and *is actively preparing to make a decision* on one or more alternative means of accomplishing that

goal and the effects can be meaningfully evaluated." (emphasis added).[2] However, this definition works against their claim, as it is clear that NEPA defines a proposal as existing *before* a decision is made, indicating a delineation between "proposal" and "decision." *Id.* In the current case, the Under Secretary made a decision, but was not involved in the proposal of that decision. *See, e.g.,* ECF No. 1, at 16, ¶ 52 (noting that the Preliminary EA for the 2021 Eastside Screens Amendment listed Ochoco Forest Supervisor Shane Jeffries as the Responsible Official, not the Under Secretary).

Again seeking to define a verb using a noun, Defendants' also rely upon the Forest Service Handbook in support of their proposition that "proposed" does not require an origin. ECF No. 24, at 10. However, their reliance on the Handbook is misplaced and the situation described is easily distinguishable, as their selected citation considers only a situation where a third-party proposal is adopted by the agency, in which case it "becomes an Agency proposal." Forest Serv., Handbook 1909.15, ch. 10, § 11.2 (2012)[Appendix at 6].[3] A more enlightening passage of the Forest Service Handbook, and one that actually applies to proposals coming from an internal agency official, supports BMBP's more natural interpretation that the originally listed Responsible Official is responsible for the proposal of new or revised plan: "The Responsible Official should consider this list of resources and issues before developing a proposed new plan or revised plan or as part of the process of developing the proposed plan." Forest Serv., Handbook 1909.12, ch. 20, § 21.12 (2015) [Appendix at 12]. Such guidance indicates that Shane Jeffries, Forest Supervisor for the Ochoco National Forest, proposed the 2021 Eastside Screens Amendment, as he was the listed Responsible Official on all relevant documents and Federal Register Notices before the FEA and DN/FONSI were published.

---

[2] This regulation, cited by Defendants at ECF No. 24, at 9, was removed on September 14, 2020. The current NEPA regulations defining "proposal" can be found at 40 C.F.R. § 1508.1(x) (2020). This definition differs slightly, but still provides that a proposal exists before a decision is made.
[3] BMBP has included the relevant portions of the Forest Service Handbook in an Appendix at the end of this brief because that Handbook is not always easily accessible online.

This also makes sense from a forest management standpoint, as a local Forest Service official is the more appropriate choice to administer a region-wide forest plan amendment such as the 2021 Eastside Screens Amendment. This provides an explanation for why the original 1994 Screens were proposed and implemented by the then-Regional Forester rather than the then-Under Secretary. *See* ECF No. 1, at 15, ¶ 49. The Eastside Screens and the management of national forests in eastern Oregon and southeastern Washington have always been a regional concern. Nothing about the 2021 Eastside Screens Amendment justifies the "rare occurrence[]" of the "sparingly used" Under Secretary's attempt to excuse this regional concern from the objection process except for the fact that the Under Secretary was leaving office as a new federal administration—one that may not have rushed through this amendment process—was incoming. If there was a justifiable reason for this political overreach, it was not sufficiently explained to the public as required by 36 C.F.R. § 219.51(d). ECF No. 24, at 2, 7.

Finally, Defendants cite to the Fourth Circuit case *Wild Virginia v. U.S. Forest Service*, in which the Fourth Circuit held that a third-party proposal for a Forest Service site-specific project—which called for the Service and the Bureau of Land Management to allow the Mountain Valley Pipeline to cross the Jefferson National Forest in Virginia and West Virginia—was legally exempt from the objection process specifically for projects on the National Forest System. 24 F.4th 915, 926–27 (4th Cir. 2022); *see* 36 C.F.R. Part 218 ("Project-Level Predecisional Administrative Review Process"); ECF No. 24, at 10–11. However, this case is easily distinguishable.

*Wild Virginia* involves a third-party proposal, which inherently injects ambiguity into the origin of a project, and therefore should not be analogized to an internal agency decision where "the language of the regulation defining 'reviewing officer' presume[s] that officers within the agency make proposals. 24 F.4th at 927 (4th Cir. 2022) (citing 36 C.F.R. § 218.3(a)). In the case of a third-party proposal, the Fourth Circuit determined that "[t]he regulations governing the predecisional review process make clear that a proposal … does not mean the application triggering action by the Forest Service but, rather, how the Forest Service decides to act in

response to that application." *Id.* However, in the current case, where the proposal clearly came from an internal agency official rather than a third party, that interpretation does not apply. Where there is clearly an agency official responsible for the origin of a proposal, "the language of the regulation defining 'reviewing officer'" makes it clear that the origin of a proposal is an integral part of the objection process. *Id.*

Because the ordinary meaning of "proposed"—gleamed from dictionary definitions, the regulatory scheme, and the purpose of the regulations themselves in limiting the Under Secretary's discretion—is unambiguous in its implication of the origin or formation of a proposal rather than its culmination, "[t]he regulation then just means what it means." *Kisor*, 139 S. Ct. at 2415 (2019). This regulation is not intended to provide the Under Secretary with unchecked discretion in the administration of NFMA and the management of our national forests regarding whether there will be an objection process. Instead, the regulation limits said discretion to avoid the objection process for plan amendments to the "rare occurrences" where the Undersecretary actually proposes the amendment. ECF No. 24, at 7. Taken as a whole and put in simple terms, Defendants' position would allow the Under Secretary to come in at any point in the development of any plan amendment—including amendments he had no hand in proposing—and attach his name to it in order to prevent such a proposal from undergoing the objection process. *See* ECF No. 24, at 11. The agency may argue that it "anticipates that approvals of … plan amendments … by the Secretary of Under Secretary … to be rare," *Id.* at 7 (citing 77 Fed. Reg. 21,247–48), but using their interpretation, there is absolutely nothing that guarantees this to be the case, or checks the Under Secretary's discretion in any way.[4] Such an interpretation is arbitrary and capricious and cannot withstand judicial scrutiny, nor is it due any deference.

---

[4] That is especially true when, as BMBP discusses below, Defendants also argue that the only explanation the Under Secretary must give for exercising this discretion and denying the public an objection process is to cite his supposed authority to do so, making the Under Secretary even less accountable to the public.

### ii. __Even if the Court believes the regulation to be ambiguous, Defendants' interpretation is not reasonable, and is therefore not due deference.__

However, even if the Court determines the language of 36 C.F.R. § 219.51(b) to be genuinely ambiguous—that the ordinary meaning of "proposed" does not contemplate an origin in any way, but may as well be a synonym for "decide"—deference to an agency's interpretation is only due if said interpretation is "'reasonable,' is based on the agency's 'substantive expertise,' 'reflect[s] [the agency's] fair and considered judgment,' and represents 'the agency's authoritative or official position.'" *Attias*, 968 F.3d at 937 (quoting *Kisor*, 139 S. Ct. at 2415–17).

As discussed above, Defendants' interpretation is far from reasonable. By conflating the terms "proposed" and "decided," Defendants' interpretation would allow for the autocratic administration of the management of our national forests, where the Under Secretary could sign any final decision document for any forest plan or plan amendment with impunity. There would be absolutely no limit on the authority of the Under Secretary to avoid the objection process every single time the Forest Service wanted to amend or revise a Forest Plan. Regardless of the ambiguity of a regulation, such an unreasonable interpretation cannot withstand judicial scrutiny. *See U.S. v. Home Concrete & Supply, LLC*, 566 U.S. 478, 493, n. 1 (2012) (SCALIA, J., concurring) ("Whether a particular statute is ambiguous makes no difference … if the agency interpretation is clearly beyond the scope of any conceivable ambiguity. It does not matter whether the word 'yellow' is ambiguous when the agency has interpreted it to mean 'purple.'").

This *Kisor* factor also considers procedural fairness, dissuading courts from applying *Auer* deference to a "new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties." 139 S. Ct. at 2417–18. Once an interested party like BMBP participates in the public participation process outlined in 36 C.F.R. Part 219, it must abide by specific regulations, such as those detailing the process to file an objection at 36 C.F.R. § 219.54, thus becoming a regulated party. And given that BMBP was promised an objection process in official Federal Register Notices, the reneging of that promise on the basis of an

unreasonable interpretation upset BMBP's reliance interests and created the exact type of unfair surprise that prevents courts from granting *Auer* deference. *See Kisor*, 139 S. Ct. at 2420–21.

Further, Defendants can point to nothing to support their interpretation that may be fairly considered the Forest Service's "authoritative or official position." *Kisor*, 139 S. Ct. at 2416. Defendants' reliance on the preamble to the 2012 planning rule in defense of their claim that an amendment *made* is the same as an amendment *proposed* is misplaced, as this is far from an authoritative interpretation. ECF No. 24, at 7 (citing 77 Fed Reg. 21,247–48 (Apr. 9, 2012)). BMBP sets out this supposed interpretation, which takes the form of a response from the agency to comments about its proposed regulation, in full:

> Comment: Secretary decisions subject to administrative review. Some respondents felt decisions made by the Secretary or the Under Secretary for Natural Resources and Environment affecting the Forest Service should be subject to administrative review.

> Response: Land management plan decisions made by the Secretary or Under Secretary for Natural Resources and Environment have never been subject to appeal or objection. The Department chooses not to change this approach. The Agency anticipates that approvals of plans, plan amendments, or plan revisions by the Secretary or Under Secretary will continue to be rare occurrences.

77 Fed. Reg. 21,247-48 (April 9, 2012).[5]

If this was intended to represent an authoritative or official agency interpretation, the agency should have actually been *authoritative* and included some explanation along the lines of: "In this regulation, we are interpreting the word 'proposed' to be synonymous with 'made' or 'decided.'" At the very least, one would expect an official agency interpretation of 36 C.F.R. § 219.51(b) to actually use the term "proposed"—the actual word used in the regulation—at least once. The agency did not do so here. *See* 77 Fed Reg. 21,247–48. The supposedly authoritative

---

[5] BMBP can find no basis for the assertion in this response that plan amendment decisions made by the Under Secretary were not previously subject to the appeal process, and the response cites none. *See* 36 C.F.R. § 217.4, Decisions not subject to appeal (1993) (making no mention of decisions made by the Under Secretary or the Secretary). In fact, contrary to the assertion in the Forest Service's response to public comments, the old appeal regulations indicate the Secretarial offices were intended to be a reviewing party of last resort, *see* 36 C.F.R. § 217.7(c)–(d) (1993), rather than being directly involved in the plan amendment process.

interpretation should also be clear, or at least less ambiguous than the regulation at issue. But far from being clear, Defendants are arguing that the public should have inferred, from the agency's use of the term "decisions made" in its response to a comment, that the agency interpreted the regulation to mean that any decision made or signed by the Under Secretary, even plan amendments that the Under Secretary did not propose, are exempt from the objection process. Such an inference is not clear or reasonable. More importantly, an agency interpretation that requires such an inference in order for it to be understood, cannot be called an authoritative interpretation. Finally, the agency's interpretation by inference actually significantly increases the Under Secretary's discretion by expanding the situations where the Under Secretary can avoid the objection process. That expanded discretion is at odds with the agency assurance in its response that such occurrences will "be rare."

Should BMBP succeed in this legal challenge, there would be no threat to the ability of the Under Secretary or "the Agency to act nimbly in solving the many challenges threatening the health of our national forests" because BMBP in no way challenges the legality or constitutionality of 36 C.F.R. § 219.51(b). ECF No. 24, at 2. This is another thread of Defendants' argument intended to scare the Court into thinking BMBP is challenging the authority of the administrative state itself. Instead, BMBP is simply seeking to ensure the Forest Service and USDA follow the reasonable regulations that the agencies themselves promulgated. Nor would BMBP's legal challenge "strip the Under Secretary of his lawfully delegated authority to make final decisions in the first instance whenever the Department of Agriculture amends a forest plan or plans" or "have absurd consequences for the Secretary." ECF No. 24, at 8–9. Again, BMBP is not alleging that 36 C.F.R. § 219.51(b) is legally invalid, just that it was violated in the current instance where the Under Secretary clearly did not propose the 2021 Eastside Screens Amendment. If the Under Secretary wished to be the Responsible Official for a plan amendment which he did not propose, he is within his authority to do so; however, should he do so without subjecting the decision to the pre-decisional objection process, that would be a violation of 36 C.F.R. § 219.51(b). Moreover, if the Under Secretary truly wished to "act

RESPONSE TO DEFENDANTS' MOTION TO DISMISS                                    21

nimbly" in amending the Eastside Screens, he could have actually proposed the amendment and finalized his proposal immediately after the public comment period ended in October of 2020 rather than waiting until January of 2023 right before he left office. *See* ECF No. 1, at 17–18, ¶ 54.

If the regulation is truly ambiguous, as Defendants appear to be arguing, the Court may want to wait to rule on its proper interpretation until it has the entire underlying administrative record before it. That record could be a potential source of more authoritative or official documents that might provide additional context for interpreting the regulation. At a minimum, that record would show how Defendants actually applied this regulation throughout their decision-making process. BMBP does not believe the regulation is ambiguous or subject to the interpretation pressed by Defendants. But the Court need not make a final ruling in that regard now. It can simply deny Defendants' motion, declining to adopt their strained interpretation "as a matter of law" because it could be beneficial for the Court in determining the appropriate interpretation of 36 C.F.R. § 219.51(b) to allow this litigation to continue to a point where the administrative record is required to be filed by Defendants.[6] Then, with the benefit of that complete context, the Court could rule on this issue.

Because the Forest Service failed to hold an objection process for a plan amendment the Under Secretary did not propose, both the 2021 Eastside Screens Amendment to the FWNF Plan and the South Warner Project that relies on the amended Forest Plan are illegal. Therefore, BMBP's Counts One and Three are legally valid claims on which this Court may grant it the requested relief. *See* ECF No. 1, at 21–23.

---

[6] BMBP has seen no evidence that the Under Secretary was in any way involved with the 2021 Eastside Screens Amendment prior to the publication of the FEA and DN/FONSI. The fact that Defendants' can cite to nothing indicating such involvement and are seeking to dismiss this valid legal challenge prior to providing the administrative record for this decision would indicate that no such evidence exists.

**B.** **The Under Secretary did not adequately explain why there would be no objection process for the 2021 Eastside Screens Amendment.**

To begin, Defendants' Motion mischaracterizes—for the second time, *see* ECF No. 27, at 5—the regulatory basis underpinning BMBP's legal claims, specifically referring to BMBP's insufficient explanation claim based on 36 C.F.R. § 219.51(d):

> Each of Plaintiff's claims rests on the allegation that the United States Department of Agriculture's Forest Service was required to hold an administrative pre-decisional objection period before promulgating the 2021 Eastside Screens Amendment …. That contention fails because Department of Agriculture regulations make plain that an objection period is not required for a decision … signed by the … Under Secretary of Natural Resources and Environment[.]

ECF No. 24, at 2. This is not true. As explained in ECF No. 27, at 5–6, the legal requirement for the Under Secretary to provide a sufficient explanation as to why no objection process will take place exists even if the Court determines the Under Secretary was not required to actually propose the plan amendment as required by the text of 36 C.F.R. § 219.51(b). In other words, BMBP's Count Two, ECF No. 1, at 22, ¶ 66, although not an alternative claim, is one that is not predicated on whether or not the Forest Service was required to provide for an objection process.

36 C.F.R. § 219.51(d) requires that, when any plan amendment is not subject to the objection process, "the responsible official shall include an explanation with the signed decision document." In the current case, that "explanation" was simply: "In accordance with the regulation at 36 CFR 219.51(b), this plan amendment is not subject to objection (administrative review) *because it is signed by the Under Secretary* for Natural Resources and Environment. As such, this decision is the final administrative determination by the U.S. Department of Agriculture." ECF No. 1, at 18, ¶ 55 (citing the 2021 Eastside Screens Amendment DN/FONSI, at 13) (emphasis added). However, this is not even what the language of 36 C.F.R. § 219.51(b) requires. As discussed above, the two sentences of the regulation serve different functions, with the first indicating what proposals are not subject to the objection process and then second indicating when such a proposal becomes a final agency action for purposes of the APA. Nowhere in the text of 36 C.F.R. § 219.51(b) does it say the Under Secretary may exempt a plan amendment from the objection process by *signing* it.

RESPONSE TO DEFENDANTS' MOTION TO DISMISS                    23

Moreover, Defendants' arbitrary interpretation of 36 C.F.R. § 219.51(b) makes the explanation requirement all the more important. If, as put forward in Defendants' Motion to Dismiss, the Under Secretary has the discretion to sign any plan amendment—including those that have historically and appropriately been decided by *regional* Forest Service officials—and exempt it from the objection process, such an action should be sufficiently explained to ameliorate public concerns about the management of their national forests and avoid the arbitrary exercise of that discretion. The fact that BMBP and other interested parties have no understanding of why the Under Secretary felt it appropriate or believed it necessary to approve a *regional* plan amendment and deny the public its promised objection process while sitting across the country in Washington, D.C. renders his explanation arbitrary and capricious.

Defendants first attempt to exempt themselves from their obligation to provide an actual, cogent and reasonable explanation for why the Under Secretary exercised his discretion to prevent an objection process by citing to *Merrill Ditch-Liners, Inc. v. Pablo,* 670 F.2d 139,141 (9th Cir. 1982). ECF No. 24 at 12. But that case is addressing the narrow situations where Congress itself, in a statute, has committed certain actions to agency discretion as a matter of law. *See* 670 F.2d at 141 (citing to 5 U.S.C. § 701(a)(2) and *Citizens to Preserve Overton Park v. Volpe*, 401 U.S 402, 410 (1971)). Defendants do not cite to any statute that would trigger Section 701(a)(2) and exempt the Under Secretary's decision from review under the APA or to prevent a court from requiring that the "explanation" mandated by 36 C.F.R. § 219.51(d) be sufficient to allow for judicial review and a determination that the Under Secretary did not exercise his discretion in an arbitrary or capricious manner.

As noted above, the APA requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action." *Gifford Pinchot Task Force*, 2014 WL 3019165, at *3 (D. Or. July 3, 2014) (citing *Motor Vehicles Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The *State Farm* court reaffirmed the principle that "an agency must cogently explain why it has exercised its discretion in a given manner." 463 U.S. at 48–49 (1983) (collecting cases); *see also Fed. Commc'ns Comm'n v. Prometheus Radio Project*,

141 S. Ct. 1150, 1158 (2021) ("The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."). Defendants are arguing that no such satisfactory explanation is required, and the Under Secretary can simply explain away his discretionary actions by misquoting the relevant regulation. ECF No. 24, at 12. In effect, Defendants are arguing that their NFMA explanation requirements require less of the Under Secretary than does the APA itself. But nothing in the APA allows an agency, in its own regulations, to effectively exempt its discretionary decisions from effective judicial review. Therefore, the circular explanation offered by the Under Secretary—essentially that "there is no objection process because the applicable regulation supposedly gives me discretion to sign the decision and thereby deny the public an objection process"—is arbitrary and capricious, in violation of the APA.

Defendants rely upon *Forest Service Employees for Environmental Ethics v. U.S. Forest Service*, 726 F. Supp. 2d 1195, 1212 (D. Mont. July 27, 2010) ("The discussion is brief, but the regulations require nothing more. 40 C.F.R. § 1508.9.") when arguing that no explanation beyond an inaccurate restatement of 36 C.F.R. § 219.51(b) is required and claim that "Plaintiff points to no authority requiring a more detailed explanation—nor could it[,]" ECF No. 24, at 12). But as already noted, the APA itself requires more. Moreover, unlike the current case, in the case Defendants cite there was at least *some* substantive discussion regarding how the agency exercised its discretion under the regulation at issue, 40 C.F.R. § 1508.9:

> The Forest Service discusses the effects of fire retardant drops on fish and aquatic habitat in the Environmental Assessment. … The analysis recognizes risks to fish from retardant drops, describes the factors affecting mortality, recites the provisions of the 2000 Guidelines intended to limit drops in waterways, and provides data indicating that drops in waterways in infrequent relative to the total number of drops ("14 accidents over 8 years").

*Forest Serv. Emps. For Env't Ethics*, 726 F. Supp. 2d at 1212 (D. Mont. 2010) (internal citations to the administrative record omitted). Had the Forest Service simply stated it had exercised its discretion under 40 C.F.R. § 1508.9(a)(1), without actually providing a cogent or reasonable basis for doing so, such an explanation would have undoubtably not have been upheld by the

District of Montana. Such is the analogous case here, and such a flippant explanation cannot stand up to the legal requirements of 36 C.F.R. § 219.51(d) or the APA.

The Under Secretary for Natural Resources and Environment failed to provide an explanation as required by 36 C.F.R. § 219.51(d) and instead simply misquoted the text of a related regulation, rendering the 2021 Eastside Screens Amendment arbitrary and capricious. Therefore, BMBP has pled viable claims in both Count Two and Count Three of its complaint— that both the 2021 Eastside Screens Amendment to the FWNF Plan and the South Warner Project that relies on the amended Forest Plan are not in accordance with law under the APA. ECF No. 1, at 22, ¶¶ 66–67.

## VI.    CONCLUSION

For the foregoing reasons, accepting as true all factual allegations outlined in BMBP's Complaint (ECF No. 1) and drawing all inferences in favor of BMBP as the nonmoving party, BMBP has alleged three sufficiently pled legal claims upon which this Court may grant relief. Therefore, BMBP respectfully requests the Court deny Defendants' FRCP 12(b)(6) Motion to Dismiss.

Dated: February 15, 2023

*s/Austin Starnes*_____
Austin Starnes, OSB No. 224970
Blue Mountains Biodiversity Project
5113 SE 30th Ave, Apt 237
Portland, OR 97202
Tel: 317-964-3776
Email: austin@bluemountainsbiodiversityproject.org

Thomas Buchele, OSB No. 081560
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97219-7799
Tel: 503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

*Attorneys for Plaintiff*

# Appendix

[Excerpts from Forest Service Handbook]



**FOREST SERVICE HANDBOOK
NATIONAL HEADQUARTERS (WO)
WASHINGTON, DC**

**FSH 1909.15 – NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK**

**CHAPTER 10 – ENVIRONMENTAL ANALYSIS**

**Amendment No.:** 1909.15-2012-3

**Effective Date:** June 25, 2012

**Duration:** This amendment is effective until superseded or removed.

**Approved:** LARENDA KING              **Date Approved:** 06/22/2012
              Service-wide Directive Manager

**Posting Instructions:** Amendments are numbered consecutively by handbook number and calendar year. Post by document; remove the entire document and replace it with this amendment. Retain this transmittal as the first page(s) of this document. The last amendment to this handbook was 1909.15-2012-2 to 1909.15_contents.

| New Document | 1909.15_10 | 47 Pages |
|---|---|---|
| **Superseded Document(s) by Issuance Number and Effective Date** | 1909.15_10 (Amendment 1909.15-2011-1, 04/01/2011) | 47 Pages |

**Digest:**

<u>11.6</u> - Makes technical corrections to revise references.

WO AMENDMENT  1909.15-2012-3                                                      1909.15_10
EFFECTIVE DATE:  06/25/2012
DURATION:  This amendment is effective until superseded or removed.

**FSH 1909.15 – NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK
CHAPTER 10 – ENVIRONMENTAL ANALYSIS**

## Table of Contents

**[Table of Contents removed by BMBP for brevity]**

WO AMENDMENT  1909.15-2012-3                                                      1909.15_10
EFFECTIVE DATE:  06/25/2012
DURATION:  This amendment is effective until superseded or removed.

**FSH 1909.15 – NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK
CHAPTER 10 – ENVIRONMENTAL ANALYSIS**

This chapter is organized by the sequence of events that typically occur in the environmental analysis process, from conducting scoping (sec. 11) to using an interdisciplinary analysis (sec. 12) to developing alternatives (sec. 14) and estimating effects (sec. 15).  Once the analysis is underway, the type of environmental documentation can be determined (sec. 17).  After a decision is made, changes or new information may be handled as described in section 18.  Exhibit 01 in section 11.6 describes the environmental analysis process.

For ease of reference, Council on Environmental Quality (CEQ) regulations for implementing requirements of the National Environmental Policy Act (NEPA) are set out in boldface type and block-indented and Forest Service regulations, that supplement the CEQ regulations are in boldface type, italicized, and block indented.

Under the National Environmental Policy Act (NEPA), the Agency conducts environmental analyses to assess the nature and importance of the physical, biological, social, and economic effects of a proposed action and its reasonable alternatives.  Conclusions are reached about the significance of the effects on the human environment.  These conclusions about the significance of effects determine the levels of analysis and documentation.



**Forest Service Planning Model**

## 11 - CONDUCT SCOPING

Although the Council on Environmental Quality (CEQ) regulations require scoping only for environmental impact statement (EIS) preparation, the Forest Service has broadened the concept to apply to all proposed actions.

> ***Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS (§220.6).***  (36 CFR 220.4(e)(1))

WO AMENDMENT 1909.15-2012-3                                                              1909.15_10
EFFECTIVE DATE: 06/25/2012
DURATION: This amendment is effective until superseded or removed.

**FSH 1909.15 – NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK
CHAPTER 10 – ENVIRONMENTAL ANALYSIS**

The process of scoping is an integral part of environmental analysis. Scoping includes refining the proposed action, determining the responsible official and lead and cooperating agencies, identifying preliminary issues, and identifying interested and affected persons. Effective scoping depends on all of the above as well as presenting a coherent proposal. The results of scoping are used to clarify public involvement methods, refine issues, select an interdisciplinary team, establish analysis criteria, and explore possible alternatives and their probable environmental effects.

The methods and degree of the scoping effort undertaken for a given project vary depending on scope and complexity of the project (see the CEQ scoping guidance).

> ***Scoping shall be carried out in accordance with the requirements of 40 CFR 1501.7. Because the nature and complexity of a proposed action determine the scope and intensity of analysis, no single scoping technique is required or prescribed.*** (36 CFR 220.4(e)(2))

Selection of scoping techniques should consider appropriate methods to reach interested and affected parties. For example, a project with potential localized effects to a small community might consider posting fliers at locations where they are likely to be seen.

Part of scoping includes other requirements such as putting a notice of intent to prepare an EIS in the Federal Register (see ch. 20).

For projects subject to legal notice of proposed actions, consult an appeal or objections coordinator and applicable appeal or objections regulations for current direction and clarification (see also FSH 1509.12). Just complying with these notice requirements may not be adequate scoping.

Except where required by statute or regulations, the responsible official may adjust or combine the various steps of the process outlined in this chapter to aid in the understanding of the proposed action and identified issues.

The following direction on scoping from the CEQ regulations applies to the preparation of an EIS. The Forest Service applies the concept of scoping to all proposals without regard to whether or not the results of the analysis are to be documented in an EIS, an environmental assessment (EA), or categorically excluded (CE) from these documents.

> **There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping . . .**
>
> **(a) As part of the scoping process the lead agency shall:**

WO AMENDMENT 1909.15-2012-3                                                    1909.15_10
EFFECTIVE DATE: 06/25/2012
DURATION: This amendment is effective until superseded or removed.

**FSH 1909.15 – NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK
CHAPTER 10 – ENVIRONMENTAL ANALYSIS**

**(1) Invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under §1507.3(c). An agency may give notice in accordance with §1506.6.**

**(2) Determine the scope (§1508.25) and the significant issues to be analyzed in depth in the environmental impact statement.**

**(3) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (§1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.**

**(4) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.**

**(5) Indicate any public environmental assessments and other environmental impact statements which are being or will be prepared that are related to but are not part of the scope of the impact statement under consideration.**

**(6) Identify other environmental review and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently with, and integrated with, the environmental impact statement as provided in §1502.25.**

**(7) Indicate the relationship between the timing of the preparation of environmental analyses and the agency's tentative planning and decision making schedule.** (40 CFR 1501.7)

For additional direction on scoping, see CEQ's Memorandum for General Counsels, NEPA Liaisons and Participants in Scoping.

## 11.1 - Organize Scoping Effort

The NEPA requires a systematic, interdisciplinary approach to ensure integrated application of the natural and social sciences and the environmental design arts in any planning and decision making that affects the human environment (42 U.S.C. 4332(2)(A)).

The responsible official may choose whether or not to establish an interdisciplinary (ID) team and designate a team leader to conduct scoping. However, the decision not to establish an ID team does not relieve the Forest Service of the responsibility to take an interdisciplinary

WO AMENDMENT 1909.15-2012-3                                                          1909.15_10
EFFECTIVE DATE: 06/25/2012
DURATION: This amendment is effective until superseded or removed.

**FSH 1909.15 – NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK
CHAPTER 10 – ENVIRONMENTAL ANALYSIS**

approach to the scoping of the proposed action.  In ensuring an interdisciplinary approach to the scoping process, responsible officials shall be guided by the direction on interdisciplinary analysis in section 12 of this chapter.

## 11.2 - Proposed Action, Purpose and Need, and Decision Framework

A proposed action is a proposal by the Forest Service to authorize, recommend, or implement an action to meet a specific purpose and need.  All proposed actions have five parts that comprise their whole: who, what, how, where, and when.

> WHO is proposing the action?
> WHAT is the action being proposed?
> HOW will the action be accomplished?
> WHERE is the action being proposed?
> WHEN is the action being proposed?

The "who" is the Forest Service, even in the case of external projects.  When the Forest Service accepts an external proponent's proposal (like a powerline or ski resort) it becomes an Agency proposal to authorize the action.  The "who" may also be the title of the responsible official, such as "The Quemado District Ranger proposes to…"

The "what" refers to the proposed activity or activities and all their parts.  Note that the "what" is almost always plural.  In stating the "what" of the proposed action, focus as specifically as practicable on describing the activities.  Connected actions (sec. 05) are included as part of the proposed action.  Consider carefully the inclusion of similar actions (sec. 05) which may be included as part of the proposed action.  Only those similar actions that are closely related to the proposal and have similar purposes and effects should be included.

The "how" is an integral part of the "what."  If a fuels reduction project is proposed, describe how it will be done: thinning, burning, or both; mechanical means or by hand?

The "where" refers to the geographic location of the project.  In stating the "where," describe the location as specifically as possible.  A map is often the best way to illustrate the "where" instead of trying to describe it solely in a narrative format.  Several scales of maps might be needed (whole district and project units).

The "when" refers to the timeframe in which the project will be implemented and completed.  If a project has several identified phases, the duration of each phase should be documented.

## 11.21 - Purpose and Need

The need for action discusses the relationship between the desired condition and the existing condition in order to answer the question, "why consider taking any action?"

WO AMENDMENT 1909.15-2012-3                                                    1909.15_10
EFFECTIVE DATE:  06/25/2012
DURATION:  This amendment is effective until superseded or removed.

**FSH 1909.15 – NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK
CHAPTER 10 – ENVIRONMENTAL ANALYSIS**

The breadth or narrowness of the need for action has a substantial influence on the scope of the subsequent analysis.  A well-defined "need" or "purpose and need" statement narrows the range of alternatives that may need to be considered.  For example, a statement like "there is a need for more developed recreation" would lead to a very broad analysis and consideration of many different types of recreation.  However, a statement like "there is a need for more developed campsites along Clear Creek" would result in a more focused analysis with consideration of a much narrower range of alternatives.

"Purpose" and "need" may be discussed separately, but normally they are discussed as one because the purpose of an action will be to respond to the stated need.

It is critical that the responsible official and interdisciplinary team members all understand and agree on the need for action.  An informed decision can only be made when everyone is working together to solve the same problem.

## 11.22 - Decision Framework

To fully describe the decision to be made, a decision framework may be identified.  This is to ensure the scope is fully described and helps assure the purpose and need, proposed action, and alternatives are relevant to each other.  The decision framework may be described in terms of whether or not to implement the action as proposed or an alternative way to achieve the desired outcome.  Often a well-described proposed action (who, what, when, where) makes the decision clear.  Situations that may need extra clarification include when:

    1.  Other agencies are involved and have their own decisions or authorizations to make.

    2.  Laws or previous decisions constrain the decision space.

    3.  More decisions will be made at a later date.

Remember to include any forest plan amendments that might be part of a decision.

## 11.23 - Review of Existing Decisions

It is important to establish whether or not a valid decision already exists.  If a decision has already been made to authorize an action in a specific area, such as livestock grazing or a special use, a new decision may not be necessary.  Review the environmental analysis documentation and assess whether there is sufficient new information, technology, or changed conditions to warrant a new analysis and decision.  If the previous analysis and decision are still valid, document this finding and continue to implement the decision.

WO AMENDMENT 1909.15-2012-3                                                      1909.15_10
EFFECTIVE DATE: 06/25/2012
DURATION: This amendment is effective until superseded or removed.

**FSH 1909.15 – NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK
CHAPTER 10 – ENVIRONMENTAL ANALYSIS**

## 11.3 - Identify Responsible Official(s) and Agencies Involved

The Agency employee who has the authority to make and implement a decision on a proposed action (36 CFR 220.3) is the responsible official for NEPA compliance. When an action is proposed, the responsible official shall identify and contact other Federal, State, or local agencies with an interest in the action.

**[Rest of chapter removed by BMBP for brevity]**

| WO AMENDMENT 1909.12-2015-1 | 1909.12_20 |
|---|---|
| EFFECTIVE DATE:  01/30/2015 | |
| DURATION:  This amendment is effective until superseded or removed. | |

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

## Table of Contents

**[Table of Contents removed by BMBP for brevity]**

WO AMENDMENT 1909.12-2015-1                                          1909.12_20
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

This chapter describes the planning requirements of 36 CFR 219 ("2012 Planning Rule") and the procedures for developing, amending, and revising land management plans during the planning phase. FSH 1909.12, chapter 10 describes the requirements for the assessment phase for developing, amending, and revising land management plans.

## 20.5 – Definitions

See the Zero Code chapter of this Handbook for definitions.

## 20.6 – Cited References

U.S. Department of Agriculture, Forest Service. 2011a. Watershed Condition Classification Technical Guide. FS-978. Washington, DC: U.S. Department of Agriculture, Forest Service. 49 p. Available at *http://www.fs.fed.us/publications/watershed/watershed_classification_guide.pdf* .

U.S. Department of Agriculture, Forest Service. 2011b. Watershed Condition Framework. FS-977. Washington, DC: U.S. Department of Agriculture, Forest Service. 34 p. Available at *http://www.fs.fed.us/publications/watershed/*.

U.S. Department of Agriculture. Forest Service. 2012a. National Best Management Practices for Water Quality Management on National Forest System Lands. Volume 1: National Core BMP Technical Guide. FS-990a. Washington, DC: U.S. Department of Agriculture, Forest Service. 177 p. Available online at *http://www.fs.fed.us/biology/resources/pubs/watershed/index.html*.

U.S. Department of Agriculture. Forest Service. [In prep]. National Best Management Practices for Water Quality Management on National Forest System Lands. Volume 2: National BMP Monitoring Protocols Technical Guide. FS-990b. Washington, DC: U.S. Department of Agriculture. Forest Service. [n.d.].

U.S. Department of Agriculture. Forest Service 2014. National Riparian Vegetation Monitoring Technical Guide: Conterminous United States. General Technical Report. Rocky Mountain Research Station-GTR-XXX. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. (Draft). Available at *http://www.fs.fed.us/biology/watershed/riparian/USFS_National_Riparian_Protocol.pdf*.

Weins, J.A., G.D. Hayward, H.D. Safford, and C.M. Giffen. 2012. Historical Environmental Variation in Conservation and Natural Resource Management. Wiley-Blackwell. Chichester, West Sussex, UK. 337 p.

WO AMENDMENT 1909.12-2015-1                                    1909.12_20
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

# 21 – DEVELOPING, REVISING, AMENDING, OR ADMINISTRATIVELY CHANGING A PLAN

This section gives guidance on the planning phase of how to develop, amend, revise, or administratively change a plan. FSH 1909.12, chapter 10 describes the requirements for the assessment phase for developing, amending, and revising land management plans. Plans provide vision, strategy, guidance, and constraints. Plans themselves do not compel Agency action or guarantee specific results.

## 21.1 – Developing or Revising Plans

## 21.11 – General Steps for Developing or Revising Plans

The Responsible Official should complete the plan development or plan revision, from the public notice of the assessment to final plan approval, within 4 years.

The plan development or revision process may be conducted in many different ways depending on the circumstances. The Interdisciplinary Team shall design the process to be transparent and efficient, to reflect principles of adaptive management, and to engage the public through meaningful opportunities for participation early and throughout the process.

The Responsible Official has the discretion to determine the scope, methods, forum, and timing of the process, subject to public notification requirements listed in 36 CFR 219.16 (see FSH 1909.12, ch. 40, sec. 42).

The Responsible Official shall establish an Interdisciplinary Team to carry out the planning process (36 CFR 219.5(b)) and provide the Team direction regarding the scope and nature of the new plan or plan revision. FSH 1909.15, chapter 10, section 12.2 gives guidance on Interdisciplinary Team selection. After the assessment phase and during planning phase, the Interdisciplinary Team develops potential plan components, and constantly reviews, evaluates, and adjusts them throughout planning phase to assure that they make a coherent whole.

Outreach to the public continues at all steps of the plan development or revision process (FSH 1909.12, ch. 40). While the Agency does not specify a sequence of steps for developing or revising plans, general steps for conducting the planning process include:

    1. Identifying the need to change the plan (36 CFR 219.7(c)(2)(i), sec. 21.21 of this Handbook).

    2. Describing the plan area's distinctive roles and contributions in the broader landscape (36 CFR 219.7(f)(1)(ii), sec. 22.32 of this Handbook).

    3. Identifying the species of conservation concern (36 CFR 219.9(c)); FSH 1909.12, ch. 10, sec. 12.52 and sec. 21.22 of this Handbook).

WO AMENDMENT 1909.12-2015-1                                                      1909.12_20
EFFECTIVE DATE:  01/30/2015
DURATION:  This amendment is effective until superseded or removed.

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

4.  Developing a proposed new plan or revised plan with public participation (36 CFR 219.4 and 219.16 (FSH 1909.12, ch. 40).

5.  Analyzing and documenting the environmental and social effects of the proposed plan components and alternatives in an environmental impact statement following the appropriate National Environmental Policy Act (NEPA) Procedures (36 CFR 220, FSM 1950, and FSH 1909.15).

6.  Reviewing the land use policies of federally recognized Indian Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments required by 36 CFR 219.4(b)(2) and document the review in the environmental impact statement.

7.  Providing an opportunity for the public to comment on the proposed new plan or revised plan and the draft environmental impact statement (36 CFR 219.16(a)(2)).  The required comment period is at least 90 days for a new plan or plan revision.

8.  Considering public comments and preparing a predecisional new plan or revised plan.

9.  Consulting with National Oceanic and Atmospheric Administration's National Marine Fisheries Service (NMFS), a division of the Department of Commerce, or the U.S. Fish and Wildlife Service, a bureau of the Department of the Interior (USFWS), or both; if the approval of a plan, or plan revision, or plan amendment may affect listed species or critical habitat or may adversely affect essential fish habitat of managed fisheries.

10.  Providing an opportunity to object to a plan, before approval (36 CFR 219.52; FSH 1909.12, ch. 50).

11.  Approving the final plan or plan revision with in a decision document that also serves as a record of decision, and notifying the public (36 CFR 219.14(a) and 219.16(a)(4)).

## 21.12 – Considerations when Preparing New or Revised Plans

In addition to identifying a need to change the plan and reviewing the assessment, the Responsible Official shall identify and consider a number of resources and issues during the planning process as listed by the 2012 Planning Rule (36 CFR 219.7(c)(2)).  The Responsible Official should consider this list of resources and issues before developing a proposed new plan or revised plan or as part of the process of developing the proposed plan.  The following list sets forth requirements, along with references for guidance and information.  Note that each consideration also may be supported by information generated during public participation or derived from some other source.

1.  The Responsible Official shall base the plan components on likely budgets and other assumptions that are realistic as required by 36 CFR 219.1(g):

WO AMENDMENT 1909.12-2015-1                                                1909.12_20
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

**(g) The responsible official shall ensure that the planning process, plan components, and other plan content are within Forest Service authority, the inherent capability of the plan area, and the fiscal capability of the unit.**

2. Before or as part of the process of developing plan components for a new plan or plan revision, the following items should be completed:

a. Identification of the species of conservation concern (§ 219.7(c)(3), § 219.9(c), sec. 21.22a of this Handbook).

b. Descriptions of the plan area's distinctive roles and contributions within the broader landscape (§ 219.7(f)(1)(ii), sec. 22.32 of this Handbook).

c. Identification of the need to change the existing plan (§ 219.7(c)(2)(i)), sec. 21.21 of this Handbook).

d. Identification of priority watersheds (§ 219.7(f)(1)(i), sec. 22.31 of this Handbook).

e. Consideration of the goals and objectives of the Forest Service strategic plan, available at *http://www.fs.fed.us*, as they relate to the plan area (§ 219.2(a)).

f. Identification of the presence and consider the importance of various physical, biological, social, cultural, and historic resources on the plan area (§ 219.6)based on the assessment and the need to change the plan components (sec. 23 of this Handbook).

g. Consideration of conditions, trends, and stressors identified in the assessment related to the need to change the plan components. (§ 219.6).

h. Inventory and evaluation of lands that may be suitable for inclusion in the National Wilderness Preservation System (§ 219.7(c)(2)(v), FSH 1909.12, ch. 70, and sec. 24.41 of this Handbook).

i. Identification of the eligibility of rivers for inclusion in the National Wild and Scenic Rivers System, unless a systematic inventory has been previously completed and documented and there are no changed circumstances that warrant additional review (§ 219.7(c)(2)(vi), FSH 1909.12, ch. 80, and sec. 24.42 of this Handbook).

j. Identification of existing designated areas other than wilderness areas and wild and scenic rivers (§ 219.7(c)(2)(iii), sec. 24 of this Handbook).

WO AMENDMENT 1909.12-2015-1                                                          1909.12_20
EFFECTIVE DATE:  01/30/2015
DURATION:  This amendment is effective until superseded or removed.

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

k.  Identification of the lands that may be suitable for timber production and identify the maximum quantity of timber that may be removed from the plan area (FSH 1909.12, ch. 60).

l.  Identification of questions and indicators for the plan monitoring program (§ 219.12, FSH 1909.12, chapter 30).

m.  Identification of other content in the plan (§ 219.7(f), sec. 22.3 and 22.4 of this Handbook).

n.  Review of land use policies of federally recognized Indian Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments required by 36 CFR 219.4(b)(2).

3.  The recommended layout for plan components and other plan content is illustrated by the plan model, described in the technical guide "Foundations of Forest Planning" available on the Ecosystem Management Coordination website at *http://www.fs.fed.us/emc/nfma/index.htm*.

4.  The Responsible Official shall ensure an integrated set of plan components that:

a.  Together provide for sustainability, ecological integrity, diversity of plant and animal communities, ecosystem services, and multiple use;

b.  Contribute to social and economic sustainability;

c.  Provide a strategic and practical framework for managing the plan area;

d.  Are within Forest Service authority, the inherent capability of the plan area, and the fiscal capability of the unit; and

e.  On balance, best meet the needs of the American people (16 U.S.C. 531).

5.  The Responsible Official should understand:

a.  Local customs and culture;

b.  Different and possibly conflicting public interests, needs, perspectives, and wants, including regional and national points of view; and

c.  The broad range of public values and the input from the public, governmental entities, and the Agency.

WO AMENDMENT 1909.12-2015-1                                                1909.12_20
EFFECTIVE DATE:  01/30/2015
DURATION:  This amendment is effective until superseded or removed.

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

## 21.13 – Opportunities for Coordinating Planning and NEPA Activities

The NEPA and Forest planning processes must be integrated.  The Responsible Official should provide direction to the Interdisciplinary team in a project initiation letter to ensure that the Interdisciplinary Team develops a strategic approach for coordinating planning and NEPA procedures.  The Forest Service NEPA directives are found in FSM 1950 – Environmental Policy and Procedures and in FSH 1909.15 – National Environmental Policy Act Handbook. See *http://www.fs.fed.us/emc/nepa/nepa_procedures/index.htm*.

Careful coordination of planning and NEPA procedures, particularly public participation, allows the Interdisciplinary Team to be more efficient by aligning planning tasks with the requirements of NEPA.  Important opportunities to integrate planning and NEPA requirements include the following:

1.  Using the results of the assessment to describe the affected environment in the environmental impact statement.  If information gaps were identified during or subsequent to the assessment, additional information might be needed to effectively describe the affected environment, consistent with NEPA requirements.

2.  Using the need to change the plan identified during the planning process to write the purpose and need statement for the environmental impact statement.  Early in the planning phase, a preliminary need to change the plan is identified and public comment is sought to help develop the need to change the plan, which in turn helps focus plan development or revision.

3.  Including both planning and NEPA requirements in the public participation strategy (FSH 1909.12, ch. 40, sec. 42).

4.  Integrating NEPA scoping, where appropriate, into public engagement activities used to support development of plan components and other plan content.  Scoping includes refining the proposed action, determining cooperating agencies, identifying preliminary issues, and identifying interested and affected persons (FSH 1909.15, ch. 10, sec. 11.) Early public engagement during the planning process can help to identify goals and concerns for the plan area.  This phase provides the opportunity for the Interdisciplinary Team to meet NEPA scoping requirements and, therefore, gain an understanding of the following elements that will be important during the NEPA analysis:

   a.  Significant issues that will frame alternatives for considerations,

   b.  Potential alternatives for analysis, and

   c.  Potential effects of alternatives.

WO AMENDMENT 1909.12-2015-1                                          1909.12_20
EFFECTIVE DATE:  01/30/2015
DURATION:  This amendment is effective until superseded or removed.

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK**
**CHAPTER 20 – LAND MANAGEMENT PLAN**

**[Rest of chapter removed by BMBP for brevity]**